# MINTER et al. v. THE BRADSTREET COMPANY, Appellant.

### Division Two, May 19, 1903.

1. **Libel: MERCANTILE AGENCY: SECURITY TO BANK.** The local agent of a mercantile collection agency reported concerning plaintiffs, who were partners in wholesale and retail merchandising, that "the opinion is expressed that a local bank has been secured." *Held*, that by "secured" was meant a chattel mortgage, and not a note signed by the firm and its members individually. *Held*, also, that said report imputed to plaintiffs a want of credit, responsibility or insolvency which necessarily and presumptively caused them pecuniary loss, and therefore was actionable *per se*.

2. ———: ———: **WORDS: WHEN ACTIONABLE.** Words written or spoken of one's trade are actionable when they might not be so if spoken of the individual simply. Every willful and unauthorized publication, written or printed, which imputes to a merchant or other business man, conduct which is injurious to his character-or standing as a merchant or business man, is libel and implies malice.

3. ———: ———: **QUALIFIED PRIVILEGE: MERCANTILE AGENCY: MALICE.** In case a publication is only a qualified privilege, the defamed plaintiff may recover notwithstanding the privilege, if he can prove that the words used were not used in good faith, but that the defendant, by himself or his agents, availed himself willfully and knowingly of opportunity for the purpose of injuring or defaming him. And in this case it is held that a false report to a mercantile agency made by its local agent that plaintiff merchants had given security to a bank, which was transmitted by said agency to their subscribers, who were wholesale merchants, was qualified. In such case the fact that the local agent may have believed at the time of making the report that it was true, affords no defense to an action for both compensatory and punitive damages, unless it was made without malice.

4. ———: **MERCHANT: SECURITY: QUESTION OF LAW.** If there was no evidence that the bank had a chattel mortgage when the local agent of a mercantile agency falsely reported concerning plaintiff merchants that "the opinion is expressed that a local bank has been secured," and a chattel mortgage was the only security to which the agent had reference, there was no error in submitting to the jury the question of whether or not the bank had security, even though it was a question of law.

5. ———: INSOLVENCY: NONSUIT. The local agent of a mercantile agency reported to its company concerning plaintiff merchants that "their present condition is not regarded as particularly flattering, and seems to suggest cash dealings," and this report was transmitted by the agency to such of its subscribers as were wholesale merchants, and in a suit for damages against the agency it pleaded justification, that is, that plaintiffs were insolvent and about to fail. *Held,* that the burden was thereby cast on defendant to make good its defense and to show the publication to be true by the prepoderance of the evidence and there being evidence to show that plaintiffs were able to pay their debts, the case was properly submitted to the jury.

6. ———: COMPENSATORY AND PUNITIVE DAMAGES: SEPARATE VERDICTS. It is not necessary in a libel suit begun prior to the passage of the statute of 1895, but not tried until afterwards, that the amount of compensatory and punitive damages should be separately stated in the verdict, nor was it error for the court to refuse to so instruct.

7. ———: ———: ———: STATUTE OF 1895. The statute of 1895, requiring the petition in a libel suit to separately state plaintiff's compensatory and punitive damages, and the jury to separately state in their verdict the amount of each kind, was not retrospective, and did not apply to suits then pending.

8. **Retrospective Statute:** WORD "SHALL." The word "shall" used in statutes ordinarily applies to something to be done or to take place in the future. A statute is to be construed prospectively unless the intent that it is to be construed retrospectively is clearly expressed on its face.

9. **Libel:** MITIGATION: INSTRUCTIONS. Mitigating circumstances serve only to reduce the damages; they can not constitute a defense to an action of libel. It is not, therefore, necessary in plaintiff's instructions to include matters brought forward by defendant's pleas in mitigation.

10. ———: ———: ———: DUTY OF TRIAL COURT. It is the duty of defendant to request instructions in mitigation of damages in a libel suit; it is not the duty of the court to give such instructions unless requested to do so. [Disapproving Callahan v. Ingram, 122 Mo. 355.]

11. **Instructions:** CIVIL CASES: DUTY OF COURT. The court is not required in civil cases to instruct on all questions, when not requested to do so.

12. **Libel:** INSTRUCTION: DAMAGES: "ROVING COMMISSION". It is held that the instructions in this libel suit, which are set out in the opinion, did not give the jury a "roving commission as to damages", but sufficiently pointed out to them what were the elements of compensation that should enter into their verdict.

13. ———: ———: ASSUMPTION OF FALSITY. The instructions given for plaintiff in this libel suit do not assume the libelous reports to be false, and that defendant knew them to be false.

14. **Instructions:** REFERENCE TO EACH OTHER. It is not necessary that an instruction should refer to another, or that the issues involved in a case should be presented to the jury in one instruction. If the instructions taken as a whole present the issues fairly, and are not calculated to mislead the jury, they are all the law requires.

15. **Libel:** INVADING PROVINCE OF JURY: WAIVER. If defendant did not ask an instruction to the effect that, whether or not the publication complained of was libelous is, under the Constitution, a question for the jury, nor in its motion for a new trial raise the point that the instructions given took this question from the jury, it must be considered on appeal to have waived it. It is proper for the court to instruct the jury that in a libel suit they are "to determine the law and the fact," but it is not its duty to so instruct unless requested to do so.

16. ———: MALICE: DEFINITION. An instruction which defined malice to mean that "the report in question was prepared and published, not in good faith, but with an intent to injure plaintiffs, or with a willful and wanton neglect of the rights and interests of plaintiff's," was without substantial error.

17. **Malice:** INITIAL WITH AGENT: IMPUTED TO PRINCIPAL. The initial or primary malice of the local agent of a mercantile agency in sending to his company false reports concerning merchants which presumptively injured their credit, can not be restricted to him, if the managing officers of the company knew or had good reasons to believe that these reports by them transmitted to wholesale merchants were untrue, and yet persisted in repeating them, regardless of the injurious effect which they knew such statements would have on the business standing of such merchants, but such conduct renders each of them subject to the charge of malice, and makes the corporation chargeable therewith.

18. **Corporation:** CHARGEABLE WITH MALICE OF AGENT. A corporation is responsible in its corporate capacity for acts done by its agents, either *ex contractu* or *in delicto*, in the course of its business and their employment.

19. **Reading to Jury.** Plaintiff's counsel, in addressing the jury in a libel suit against a mercantile agency charged with sending out false reports which injured plaintiff's credit, read from a magazine a lengthy extract from a discussion on the merits and inquisitorial character of such agencies, and stated that he did so because they expressed his own views and he had not been able to commit them to memory. He did not claim to be reading from a law book, there was

nothing in the extract presenting the law of the case, and nothing that would not have been proper had it been committed to memory and recited. *Held*, not reversible error, though the practice is not to be commended.

20. **Libel:** MERCANTILE AGENCY: EXCESSIVE VERDICT. The evidence showed that plaintiffs were, at the time of the publication by a mercantile agency to their subscribers of libelous statements concerning their financial standing, merchants in good standing and credit, doing a large and prosperous business, and as a result of these reports, which were conceived and continued in malice, their credit and standing were ruined, their business wrecked and they driven out of business. At a former trial plaintiffs were given a verdict of $30,000, and a new trial was awarded on the ground of error in the instructions and excess in the award. *Held*, that a verdict of $27,000, which received the approval of the trial court, though large, should be permitted to stand.

21. ———: ———: ———: MEASURE OF DAMAGES. There is no scale by which damages are to be graduated with certainty in libel suits. To the jury, therefore, is committed the exclusive task of examining the facts and circumstances of each case, and valuing the injury. And if there is nothing in their finding to shock the understanding and to impress no dubious conviction of the jury's prejudice and passion, the courts will not interfere.

Appeal from Johnson Circuit Court.—*Hon. Jas. H. Lay,* Judge.

AFFIRMED.

*Jno. W. Noble, A. B. Logan* and *Geo. R. Lockwood* for appellant.

(1) The court erred in refusing to instruct the jury that plaintiffs were not entitled to recover on either of the clauses complained of as libelous, because: (a) The individual signatures of the partners, in addition to the partnership name, on partnership notes, constitute security for such partnership debts, and therefore it was true that the bank holding such notes had been secured. Mansur-Tebbetts Implement Co. v. Ritchie, 143 Mo. 587; s. c., 60 S. W. 87; Goddard-Peck Grocery Co. v. McCune, 122 Mo. 426; Hundley v. Farris, 193 Mo.

78; Bank v. Brenneisen, 97 Mo. 145.   (b)   Further-more, the question whether the bank had security was a question of law under the admitted facts, and the court erred in submitting that question to the jury; and as the verdict may rest on the finding of the jury as to that issue, its submission to them was error.   (c)   Every witness examined on the subject testified that plaintiffs' financial condition was not such as to entitle them to credit, and the admitted facts showed them to be insolvent under numerous decisions of this court.   And therefore defendant was justified in expressing the opinion that their condition seemed to suggest cash dealings. Judson v. Walker, 155 Mo. 177; Hoffman v. Nolte, 127 Mo. 137; Mitchell v. Bradstreet, 116 Mo. 240.   (d) The gist or sting of the publication complained of was admitted by plaintiffs or proven beyond dispute and therefore plaintiffs could not recover.   Stark v. St. Louis Republic, 61 S. W. 669; St. Louis Clothing Co. v. Hail Dry Goods Co., 156 Mo. 393.   (2)   The court erred in refusing to instruct the jury, as defendant requested, that if they found for plaintiffs and allowed both compensatory and punitive damages, the amount of each should be separately stated in the verdict, as is required by Laws 1895, page 168 (sec. 595, R. S. 1899), since the form of the verdict is a matter of procedure, in which no party has a vested right, and the law at the time of the trial governs.   To hold otherwise, would deny some the equal protection of the laws as is required by U. S. Constitution, article 14.   Sutherland on Stat. Const. (Ed. 1891), sec. 482; State v. Thompson, 141 Mo. 408; s. c., 132 Mo. 301; Messimer v. McCray, 113 Mo. 382; O'Bryan v. Allen, 108 Mo. 227; State v. Duestrow, 137 Mo. 44; State v. Taylor, 134 Mo. 109; Merriam v. Railroad, 136 Mo. 145; Sheehan v. Ins. Co., 53 Mo. App. 351; Lovell v. Davis, 52 Mo. App. 342; Spohn v. Railroad, 101 Mo. 417; Gomley v. Railroad, 35 Mo. App. 87; Anderson v. Pike, 41 Mo. App. 328; Schuster v. Weiss, 114 Mo. 158; McShane v. Sander-

son, 108 Mo. 316; State v. Jackson, 105 Mo. 196; Constitution of United States, sec. 1, article 14. (3) The court erred in that it instructed the jury at plaintiff's request for a recovery, and yet did not instruct on the issues made by the plea in mitigation of damages. Callahan v. Ingram, 122 Mo. 355; Barr v. Kansas City, 105 Mo. 550; Schroeder v. Michel, 98 Mo. 43; Owens v. Railroad, 95 Mo. 169; Sullivan v. Railroad, 88 Mo. 169; Mansur v. Botts, 80 Mo. 651; Korle v. Railroad, 55 Mo. 476; Pogsdon v. Trambo, 52 Mo. 35; Budd v. Höffheimer, 52 Mo. 297; Fitzgerald v. Hayward, 50 Mo. 516; Bank v. Currie, 44 Mo. 91; Sawyer v. Railroad, 37 Mo. 240; Laughlin v. Girardi, 67 Mo. App. 372. (4) The court also erred in refusing to instruct, as defendant requested, that plaintiffs could not recover because of the clause: "They are behind and can not meet current indebtedness;" because it instructed, at plaintiff's request, for a recovery and did not, because of its failure to instruct on that clause, instruct on all the issues. Authorities supra, and see: Douglass v. McAllister, 3 Crouch 297; Morris v. Platt, 32 Conn. 82; Carpenter v. State, 43 Ind. 373; Livingston v. Ins. Co., 7 Crouch 544. (5) In these instructions the court also erred by assuming the falsity of the report, and especially the clauses therein complained of, and that defendant knew them to be false. Hull v. St. Louis, 138 Mo. 625; Oil Well Supply Co. v. Wolfe, 127 Mo. 626; State v. Taylor, 111 Mo. 538; Moffatt v. Conklin, 35 Mo. 453; Merritt v. Given, 34 Mo. 98; Choquette v. Barada, 28 Mo. 491; Thompson v. Botts, 8 Mo. 710. (6) (a) The court, in the instructions given at plaintiffs' request, violates the Constitution of Missouri, errs in its definition of actual malice; compels the jury to find certain facts conclusive evidence of such malice, though they did not constitute malice, and might not have convinced the jury that defendant was guilty thereof; instructs upon issues not made by the pleadings, and comments upon the evi-

Vol 174 mo—29.

dence.  Const. of Mo., art. 2, sec. 14; Townsend S. & L. (4 Ed.), sec. 83; Odgers, L. & S. (1 Am. Ed.), star pp. 267, 270; Tyler v. Hall, 106 Mo. 323; State v. Sivils, 105 Mo. 534; Heller v. Pulitzer Pub. Co., 153 Mo. 214; Peck v. Chouteau, 91 Mo. 138; Finn v. S. L. Public Schools, 59 Mo. 59; Aultman & Taylor Co. v. Smith, 52 Mo. App. 35; Jones v. Jones, 57 Mo. 138; Hoffman v. Hoffman's Exec., 120 Mo. 498; Oil Well Supply Co. v. Wolfe, 127 Mo. 626; State v. Brandon, 76 Mo. App. 305; Callahan v. Ingram, 122 Mo. 373.   (b) And the court also erred in these instructions by making defendant liable, without qualification, for the alleged malice of its correspondent.   Odgers, L. & S. (1 Am. Ed.), star pp. 270, 301; Townsend (4th Ed.), secs. 117, 120, 121, 124; Railroad v. Prentice, 147 U. S. 101; Scripps v. Reilly, 38 Mich. 10; Hamilton v. Eno, 81 N. Y. 116; Detroit Post Co. v. McArthur, 16 Mich. 454.  (7)  These instructions are also erroneous in that they conflict with correct instructions given at the request of defendant, because plaintiffs' instructions submitted to the jury whether the alleged libelous language did not impute insolvency, etc., to plaintiffs, thus enlarging the language complained of, while on behalf of defendant the jury was told that if the matter charged to be libelous was "true as published," defendant was not liable. Thomas v. Babb, 45 Mo. 384; Garth v. Carrier, 60 Mo. 581; State v. Mitchell, 64 Mo. 191; State v. McNally, 87 Mo. 644; Frederick v. Allgaier, 88 Mo. 603; State v. Harrell, 97 Mo. 110; Price v. Railroad, 77 Mo. 503; Stevenson v. Hancock, 77 Mo. 614; Buddenberg v. Chouteau Trans. Co., 108 Mo. 394.  (8) The court also erred in plaintiffs' instructions by giving the jury a "roving commission" as to damages.  Harris v. K. C. Stock Yards Co., 103 Mo. 60; McGowan v. S. L. Ore & Steel Co., 109 Mo. 518.  (9) The verdict is against the evidence; is grossly excessive, and the result of passion and prejudice against defendant; and the fact that one new trial has been granted, because of erroneous in-

structions, and because the verdict was excessive, does not prevent the granting of a second new trial because of the allowance of excessive damages or the passion or prejudice of the jury. R. S. 1899, sec. 801; Boyce v. Smith, 16 Mo. 317; State ex rel. v. Horner, 86 Mo. 71; Kreis v. Railroad, 131 Mo. 533; Langston v. Railroad, 147 Mo. 457. (10) The court erred in permitting plaintiff's attorney to read to the jury from an opinion of the Supreme Court of Michigan and to argue to the jury that in libel suits the jury were the judges of the law and the facts. Heller v. Pulitzer Pub. Co., 153 Mo. 205.

*J. W. Suddath, O. L. Houts* and *Geo. P. B. Jackson* for respondents.

(1) In a case like the present the right of recovery depends upon the presence of actual as distinguished from implied or legal malice. Upon that theory the case was clearly and distinctly put to the jury. There was abundant evidence to sustain that theory and the verdict should not be disturbed. Written information concerning a merchant furnished by a mercantile agency is only protected by a qualified privilege, if not defamatory and not actuated by malice. State v. Lonsdale, 48 Wis. 348; King v. Patterson, 49 N. J. L. 417; Com. v. Stacy, 1 Leg. Gaz. 114; Lock v. Bradstreet, 22 Fed. 771; Kingsbury v. Bradstreet, 35 Hun 212; Trussill v. Scarlett, 18 Fed. 414; Erber v. Dun, 4 McCrary 160; Johnson v. Bradstreet, 77 Ga. 172; Taylor v. Church, 8 N. Y. 452; Ormsby v. Douglas, 37 N. Y. 477; Lunderlin v. Bradstreet, 46 N. Y. 188; Lorry v. Vadder, 42 N. W. 542; Sullivan v. Com. Co., 152 Mo. 268; Military Academy v. Gaiser, 125 Mo. 517. (2) It is libelous *per se* to publish of a business man that he is insolvent, or anything that imputes insolvency—as inability to pay debts—want of integrity—personal incapacity—pecuniary inability to conduct business—or

anything which in any manner is prejudicial to him in his employment or trade. In such case general damages may be recovered. Mitchell v. Bradstreet, 116 Mo. 226; 13 Am. and Eng. Ency. of Law, 314, and cases in note 1; Military Academy v. Gaiser, 125 Mo. 525; Sullivan v. Com. Co., 152 Mo. 268; Odgers on L. & S. (2 Ed.), p. 292.    (3) The defendant can be held responsible for actual malice indulged by its agents in performing the duties for which they are employed. Johnson v. Dispatch Co., 65 Mo. 539; Mitchell v. Bradstreet, 116 Mo. 226; Perkins v. Railroad, 55 Mo. 201; Eckert v. Transfer Co., 2 Mo. App. 36; Canfield v. Railroad, 59 Mo. App. 354; Haehl v. Railroad, 119 Mo. 325; Meade v. Railroad, 68 Mo. App. 92; Eads v. Railroad, 43 Mo. App. 536; Mason v. Stiles, 21 Mo. 374; Ephland v. Railroad, 71 Mo. App. 597; Samuels v. Evening Mail Ass'n, 75 N. Y. 604; Cleghorn v. Railroad, 56 N. Y. 44; Merrills v. Tariff Co., 10 Conn. 384; Maynard v. Ins. Co., 34 Cal. 54; Evening Journal Assn. v. McDermott, 44 N. J. L. 430; Pollarky v. Minchener (Mich.), 46 N. Y. 5; Bacon v. Railroad, 66 Mich. 166; note to same case in 31 A. & E. R. R. Cases, 363; Railroad v. Richmond, 73 Tex. 568; Behee v. Railroad, 71 Tex. 424; Railroad v. Behee, 21 S. W. 384; Railroad v. Harris, 122 U. S. 597. Approving the ruling that a corporation is liable for agent's malice in a libel: Railroad v. Quigley, 21 How. 207; Fogg v. Railroad, 148 Mass. 513; Bradstreet Co. v. Gill, 72 Tex. 121; King v. Patterson, 49 N. J. L. 417; Townshend on Slander and Libel, pp. 470-475, and pp. 60 and 300; 14 Am. and Eng. Ency. of Law, 815. (4) It was proper to leave to the jury to determine whether or not the language complained of imputed to plaintiffs insolvency, or conduct which would prejudice them or be injurious to them in their business standing. If the court had assumed to tell the jury that the language was libelous *per se* it might well have been complained that, on general principles, the court was invading the province of the jury, while it would have

been exceptionally erroneous in this case, because the Constitution makes the jury in a libel case the judges of both the law and the facts. To so direct the jury would be an approach towards instructing them to find a verdict for plaintiff, which can not be done in a libel case in this State.   Heller v. Pulitzer Pub. Co., 153 Mo. 205; State v. Armstrong, 106 Mo. 395; Arnold v. Jewett, 125 Mo. 252.   (5) There is no merit in defendant's third point of its brief.   The instructions given at the request of plaintiff covered every phase of the case— including mitigation of damages.   It was not required that plaintiffs in their instructions should have commented on or pointed out any evidence that defendant offered for that purpose.   If defendant thought the subject merited any special instruction it should have asked it.   All that was required of plaintiffs was that their instructions should have been comprehensive of the whole case and not exclude from the consideration of the jury the facts, if any, tending to establish any defense relied upon.   Tetherow v. Railroad, 98 Mo. 74; Browning v. Railroad, 124 Mo. 71; Hill v. Mining Co., 75 Mo. App. 643; Busmill v. Emerson, 64 Mo. App. 669; Ellingson v. Railroad, 60 Mo. App. 689; Schröeder v. Michel, 98 Mo. 48; Vinegar Co. v. Guggemos, 98 Mo. 389; Hat Co. v. Hombs, 127 Mo. 392; Wagner v. Printing Co., 45 Mo. App. 6; Barth v. Railroad, 142 Mo. 555; Liese v. Mayer, 143 Mo. 560; Robertson v. Railroad, 152 Mo. 393; Hannon v. Donohue, 153 Mo. 263; 13 Am. and Eng. Ency. Law, p. 432; 11 Am. and Eng. Ency. Law, pp. 168-171; 16 Am. and Eng. Ency. Law, pp. 585-588. (6)   The court did not err in refusing to require separate verdicts as to compensatory and exemplary damages.   The suit was instituted—and in fact once tried— long before the amendment of the Code of Practice relied upon.   R. S. 1889, sec. 6594; R. S. 1899, sec. 4177; R. S. 1889, secs. 2039, 2120, 2130, 2131, 2160, 2161, 2166; Lamberson v. Long, 66 Mo. App. 253; Powers v. Kueckhoff, 41 Mo. 429.   (7) Plaintiffs' attorney did

not read "law" to the jury and did not pretend to do so. Neither the judge nor the jury had any such thought with reference to what the attorney was reading. Appellant's counsel in effect concede that they acquiesced in the remarks of the court at the time. At all events, nothing improper was done and certainly no prejudice to defendant resulted. Cory v. Silcox, 6 Ind. 39; Legg v. Drake, 1 Ohio St. 286; Ins. Co. v. Cheever, 36 Ohio St. 201; 19 Am. and Eng. Ency. Law, p. 620; Williams v. Railroad, 126 N. Y. 96; Steffenson v. Railroad, 48 Minn. 285; Railroad v. Lamothe, 76 Tex. 219; Railroad v. Wills, 2 Tex. App. 700; Railroad v. Harman, 83 Va. 553; Gregory v. Railroad, 37 W. Va. 606. (8) The verdict was not excessive. 16 Am. and Eng. Ency. Law, pp. 585, 588; State v. Brush, 122 Ind. 42; McAllister v. Free Press, 85 Mich. 453; French v. Free Press, 85 Mich. 463; Cooley on Torts, pp. 62-64; Mitchell v. Bradstreet, 116 Mo. 226. Defendant has already had one new trial on the ground that the verdict was excessive and can not have a second one on that account. R. S. 1889, sec. 2241; R. S. 1899, sec. 801; Kreis v. Railroad, 131 Mo. 533; Langston v. Railroad, 147 Mo. 457.

BURGESS, J.—This is an action for damages for libel by the plaintiff merchants against the defendant on account of a false report, circulated in December, 1890, by the defendant concerning the plaintiffs' business standing, claiming to have been prompted by actual malice for the purpose of injuring plaintiffs in their business. Upon application of defendant the venue of the cause was changed from Pettis to Johnson county, where on a trial had in December, 1893, plaintiffs recovered a verdict for $30,000. On defendant's motion a new trial was granted upon the grounds that the court had erroneously instructed the jury, and that the damages allowed by the jury were excessive.

Thereafter in February, 1898, another trial was

had and plaintiffs recovered a verdict and judgment for $27,000, from which defendant, after filing motion for a new trial and the same being overruled, appeals.

The petition alleges:

"That said defendant is engaged in the business of conducting a mercantile agency, the general nature of which is to obtain information as to the financial standing, responsibility and credit of merchants generally throughout the United States, and to furnish such information to other merchants in the various States of the United States and Canada. And plaintiffs state that on or about the 22nd day of December, 1890, the defendant falsely, wrongfully and maliciously published concerning the plaintiffs and their said business the following false, malicious and libelous language and matter, to-wit: 'They [meaning the plaintiffs] are behind and can not meet current indebtedness.' 'The opinion is expressed that a local bank has been secured,' thereby meaning that the defendant and its agents, servants and employees and representatives entertained the opinion and belief that security had been given to a bank in the city of Sedalia, Missouri. 'Their present condition [meaning the then financial and business condition of plaintiffs] is not regarded particularly flattering and seems to suggest cash dealings' [thereby meaning that the plaintiffs were threatened with insolvency; that they were about to fail and that they were unworthy of credit]. By reason of which publication of said false, malicious and libelous language and matter concerning these plaintiffs and their business the plaintiffs have been damaged in the sum of one hundred thousand dollars."

The answer, after denying generally all of the allegations in the petition, alleges:

"That it is a corporation organized for and engaged in the business of conducting a mercantile agency, and is now, and was at all times mentioned in said petition, employed by a number of merchants and

manufacturers in the State of Missouri and elsewhere as their representative and agent, to collect, procure, preserve and report to them, said patrons or employers of defendant, reports and information as to the business, estate, property, credit, conduct, character and trustworthiness of persons and corporations engaged in trade or commerce in the State of Missouri and elsewhere, so that defendant's said employers, who are commonly known as subscribers to defendant's agency, may have the knowledge and information necessary to enable them to safely and properly conduct business with strangers or distant customers, and it is expressly agreed between defendant and its said employers, that all information, whether written, printed or verbal, furnished by defendant, its agents or servants, shall be held in strict confidence, and used exclusively for the benefit of such subscribers; and if defendant published of and concerning plaintiffs the words set out and complained of in plaintiffs' petition, or any of them, defendant had good reason to believe and did believe at the time of the alleged publication, that the same were true; and defendant further says, that the publication of said words, or any of them, if made, was made innocently, without malice, and in the usual course of business, and only to subscribers of defendant who were creditors of plaintiffs, or otherwise directly interested in the financial condition of plaintiffs, or in answer to inquiries by subscribers whom defendant believed to be creditors of plaintiffs, or otherwise directly interested in the financial condition of plaintiffs.

"And for a further answer to said petition, defendant says: That at and prior to the time of said alleged publication, to-wit, December 22, 1890, plaintiffs were indebted to the First National Bank of Sedalia in the sum of $12,000; that at said time they owned real estate of a value not exceeding $40,000, and that said real estate at said time was mortgaged for sums aggregating a large amount, to-wit, $27,000; that at said time plain-

tiffs' merchandise on hand was less than $20,000; and plaintiffs were indebted to various merchants and manufacturers from whom they had purchased goods in the sum of $20,000 upon notes and open accounts, and a large portion thereof was past due, and some of said notes or accounts were then in the hands of attorneys for collection by suit or otherwise; that on, to-wit, November 15, 1890, a note of plaintiffs for the sum of $1,750, due and payable on said day, was protested for non-payment. Defendant further says, that during the month of December, and prior to the 22nd day thereof, plaintiffs were reducing their stock of merchandise, and selling the same for less than cost and at a sacrifice. Wherefore, defendant says it is true, that at said time plaintiffs were behind and could not meet their current indebtedness; that they were seriously involved; that claims against them were in the hands of attorneys; that they had secured a local bank; that their condition was not regarded as flattering, and seemed to suggest cash dealings; that they had borrowed all they could; that they had been reducing their stock and selling at a sacrifice or loss; that they had borrowed all they could on their real estate.

"As a further answer to said petition, and to each count thereof, defendant says in mitigation of damages, that at and prior to the time of the alleged publications complained of, plaintiffs were extensively advertising in the newspapers of Sedalia that they were selling at forced sale for cash their entire stock at cost, and at manufacturer's cost, and at said times plaintiffs were largely indebted to one of the banks of Sedalia, and to the merchants and manufacturers from whom they had purchased goods, and had their real estate heavily mortgaged to secure other large indebtedness, that on, to-wit, November 15, 1890, a note of plaintiffs for $1,750, due and payable on said day, was protested for non-payment; that a portion of their indebtedness to merchants and manufacturers from whom they had purchased

goods was past due and unpaid; and claims against plaintiffs were then in the hands of attorneys for collection; and plaintiffs' stock did not at the time of the alleged publication equal, as defendant believed and now alleges, $20,000 in value. All of which defendant well knew at and prior to the time of the alleged publications complained of by the plaintiffs; and defendant says, that if it published the words complained of, it believed them to be true and published them in good faith in the usual course of its business as a mercantile agency, without malice towards plaintiffs, and in confidence to its subscribers or employers.

"Having fully answered said petition, defendant asks to be hence dismissed with costs."

The reply was merely a general denial.

The evidence on behalf of the plaintiffs tended to show the following state of facts:

The matter complained of as being libelous was written and printed on two pieces of paper as follows:

"Minter Bros.     W. & R. D. G.     Sedalia, Mo.
              Joe Minter,
              C. D. Minter.

"Have been in business as above for some years, and were heretofore quoted in fair credit without definite estimate of means, but it is now reported that they are behind, and can not meet current indebtedness, and that claims are in the hands of attorneys, but so far have been paid. The opinion is expressed that a local bank has been secured. Their present condition is not regarded particularly flattering, and seems to suggest cash dealings.

              "December 22, 1890."

On the same side of the sheet of said report above set forth, are the following indorsements, printed in red ink:

"The subscriber is hereby notified that he will be held directly responsible under subscription terms for all costs and damages which may accrue to this com-

pany, if he communicates this information, or shows this letter to the person, or persons, hereby reported.

"CHARLES F. CLARK, President.

"The correctness of this report is not guaranteed, but having been obtained by us in good faith from authorities deemed reliable, it is transmitted to you in strict confidence for your exclusive use and benefit in accordance with the terms of the contract existing between us.

"Respectfully,

"THE BRADSTREET COMPANY."

"(54).

Minter Bros.                    W. & R. Dry Goods.

Sedalia, Mo., Pettis Co.

"Upon further investigation we learn their condition is about as follows:

### Assets:

| | |
|---|---|
| Value of stock on hand | $20,000 |
| Good accounts and notes | 4,000 |
| Bad accounts and notes | 6,000 |
| Real estate valued at | 30,000 |
| | $60,000 |

### Liabilities:

| | |
|---|---|
| Real estate mortgages | $23,000 |
| Owe First National Bank, this city | 12,000 |
| Other indebtedness, mostly not due | 13,000 |

"They are said to have been reducing their stock and selling at a sacrifice. It is thought that they have borrowed all they can on their real estate.

"December 22, 1890."

On the reverse side, printed in red ink, is an indorsement, to-wit:

"The correctness of this report is not guaranteed, but having been obtained by us in good faith from authorities deemed reliable, it is transmitted to you in

strict confidence for your exclusive use and benefit, and in accordance with the terms of the contract existing between us.

"Respectfully,
"THE BRADSTREET COMPANY."

This report was prepared by the defendant and sent out under the circumstances and in the manner mentioned hereafter. The defendant as a corporation was organized with a full corps of officers, having its headquarters in the city of New York, with other chief officers for districts in various other cities in the United States, one being in St. Louis and another in Chicago. In the various towns and cities of the country it had what was designated "a correspondent," who was a person employed by the defendant for the purpose of inquiring into the affairs of the merchants in his particular locality, and making daily reports concerning the same to the chief officer for the district in which he was located. Such reports when received were taken charge of by other employees of the defendant in that office and tabulated for use in communicating with subscribers, and were also forwarded to the head office in New York City. Sometimes, if requests had been previously made, or the defendant company had any reason to think that a particular firm desired immediate information concerning a merchant in any part of the country, they would send a copy of the report without any special request by the subscriber. Again, if their local correspondent had sent any information which was considered important for their subscribers to know, a note would be sent to the subscribers in that line of business or to those supposed to be interested, suggesting that important information had been received concerning the party named, and for the subscribers if interested in that party, to call, or in some other form suggested to the subscriber the advisability of his securing the information concerning the party mentioned. Then there was a form provided by the use of which a subscriber requested information concerning the party

therein named, and which would be sent to the defendant company's office for the proper district, and thereupon the information would be sent in the form of a report similar to that heretofore set forth and under the conditions mentioned. For these reports the defendant charged its subscribers at specified prices, varying according to the number of reports furnished in a given time. The entire method of conducting the business of the defendant was detailed at length in the evidence given on the trial.

It was testified by the party in charge of the St. Louis office of defendant, to which the report from the local correspondent at Sedalia was sent, that it was customary before sending out a report to verify the information sent by the local correspondent by inquiries from local banks and other sources considered reliable, but no such verification was attempted in the case at bar.

In May, 1887, plaintiffs, in connection with one Rhodes as their partner, purchased the stock of goods and business of what was known as the Campbell Mercantile Company in Sedalia, and the plaintiffs came to Sedalia to run the business there, until the 1st of January, 1888, when they bought out Mr. Rhodes's interest in a store at Kansas City, which they as partners with him then owned, and moved the Kansas City store to Sedalia, and from that time on did a prosperous business both as retail and jobbing merchants. Subsequently they established a branch store in Lamonte, in Pettis county. They carried a large stock of dry goods, carpets, cloaks and general notions, and had their store arranged with departments for each of these lines of goods. In addition to the money they had invested in their business they also owned a large amount of real estate, consisting partly of a farm in Henry county, of lands near Sedalia, and the property where they did business, which was formerly known as the Methodist Church property, on Ohio street. After having pur-

chased this property they remodeled the building so as to make it a first-class business house with all modern appointments. With the exception of a small piece of swamp land in Southeast Missouri, which Joe Minter had acquired in some outside transaction, and which was not regarded of sufficient value to be treated as an asset of the firm, and the forty-seven acres on which C. D. Minter lived, they owned everything as partners. There was a difference in the testimony of the witnesses as to the value of the stock of goods and of the real estate owned by the plaintiffs, and also as to the amount of their indebtedness, which was presented to the jury. The great weight of the evidence, and especially that of the plaintiffs themselves and the men employed in their store, and who were familiar with their stock of goods, tended to establish that the plaintiffs were entirely solvent, and that their assets were worth largely in excess of their liabilities. The plaintiffs bought more or less on credit, discounting their bills when it was convenient and profitable to do so, and also selling on credit. It was shown by a number of witnesses that under the business methods prevailing in this country, and especially in the West, it is necessary, in order to succeed in merchandising, to keep up the stock of goods in all lines, and that an active merchant must be constantly buying to replenish some parts of his stock, while he may have an abundance of other kinds on hand, and that he must be able to supply these different lines of goods promptly and without delay, otherwise his trade will become seriously impaired; and that the effect of derogatory statements concerning the financial condition of a merchant will prevent his carrying on business in the customary way and keeping his stock up to the proper standard, and the effect upon his business is, that though he may have a large amount of goods on hand representing a very large capital, yet it soon becomes much deteriorated and in some respects totally worthless, unless the business is kept up in the

manner suggested. Some of the defendant's witnesses who were examined for the express purpose of showing what construction would be put upon the statements contained in the publication made by the defendant, stated in effect that to make the statements which were made, would be ruinous to any man engaged in mercantile business.

After engaging in business in Sedalia, the plaintiffs established a large and profitable jobbing trade in the district tributary to Sedalia and had several men on the road selling goods for them. Their business had attained very considerable proportions, and, as is frequently the case in such business, there were some parties owing them who were slow to pay, and sometimes circumstances arose which required the services of an attorney to assist in collecting claims owing to the plaintiffs. For this purpose the plaintiffs had at different times employed a lawyer by the name of William Parmerlee, located in Sedalia, who was an active, energetic young man, and whom they desired to assist. This same Parmerlee was the person whom the defendant had employed at Sedalia to procure information concerning the merchants there and to send the same to the defendant's other agents, as the basis for reports to be formulated and circulated by the defendant. In the summer or fall of 1890 the plaintiffs had seen fit, for reasons satisfactory to themselves, to employ another attorney in connection with other persons to secure the payment of claims against a party in Benton county. Parmerlee took exceptions to this action on the part of the plaintiffs, and thereupon, as announced by him to several members of the bar in Sedalia, he proposed to get even with the Minter Brothers, and that he would cause their ruin, or, as he expressed it once, that, in a business sense, he would "have them under the ground inside of ninety days." About the middle of November a note for $1,750 due by plaintiffs to H. B. Claflin & Co., of New York, was protested. The note

was payable at the First National Bank of Sedalia. Instead of being sent to that bank for collection, it was sent to the Citizen's National Bank. Just when it was sent there the evidence does not indicate; but there was no notice sent to the plaintiffs that the Citizens' Bank held the note, and late on the last day of grace the Citizens' Bank, without any notice or intimation to the plaintiffs, presented the note at the counter of the First National Bank, and as it was not paid *instanter,* the Citizens' Bank immediately protested the note, and mailed the notice to the several indorsers, and returned the note to the party from whom it got it. In a few hours C. D. Minter received word from the First National Bank that such a note had been presented and he repaired immediately to the Citizens' Bank, and found that the note and protests had been mailed. On that day he wrote to Claflin & Co., giving his reasons for not paying the note, in which he says, "We were delayed 30 days longer on building than contract called for, causing a little too close figuring." He however sent to Claflin & Co., on November 19, a check in payment of this note, and in course of a few days received acknowledgment with return of note. This together with the fact that the plaintiffs, as was their custom, just prior to the close of the year, advertised in the Sedalia papers in such manner as to attract the attention of the public, and stated in some of their advertisements that they were selling for less than cost, and sometimes for less than manufacturer's cost, and various other forms of statements which were attractive to the public, defendant relied upon in mitigation of damages. Shortly after the threats made by Parmerlee, some sort of reports were sent by some one to the discredit of the plaintiffs, but just what they were or positively who sent them, was not known. At all events, Farwell & Co., of Chicago, who were the largest creditors of the plaintiff, sent their representative, Musgrave, to Sedalia, to inquire into the matter, which he did, making a thorough

investigation of their stock of goods, their books and their standing in the bank with which they did business, and of their affairs in general, and he made a report to his firm after which they continued to sell plaintiffs goods on credit as before. In consequence of these reports, some creditors of the firm commenced to send in their claims, even though some of them were not due, and also to make inquiries of the plaintiffs as to the meaning of these reports. Thereupon Charles Minter immediately went to interview the local representative of the reporting agencies. He first met Guy Cope, who represented the Dun agency at Sedalia, and learned from him that he had sent no reports concerning them. Thereupon he called upon Parmerlee, and told him that he understood that injurious reports had been sent out, and that Guy Cope had denied sending any, and therefore Parmerlee must be the man who did it, which was denied in a qualified way. Along about the same time, either late in November or early in December, the defendant's representative at Sedalia, Parmerlee, pretended that he knew of circumstances which indicated that the plaintiffs had given a chattel mortgage upon their stock of goods to the First National Bank of Sedalia. He talked about this to Jas. T. Montgomery, who assured him that there was no foundation for any such statement, and Parmerlee also consulted with Guy Cope, who was representative of the Dun agency at Sedalia at that time, and with whom Parmerlee talked frequently about what was going on in Sedalia, and asked him what he thought of Minter Bros. Cope told him that he understood that unjustly some unfavorable reports had been circulated about them, and that he thought that unless the creditors were lenient, it might cause trouble. Thereupon Parmerlee said he had an impression that the plaintiffs had given the bank a mortgage on their stock of goods, and that it was being held off the record. Cope told him that that was wholly

Vol 174 mo—30.

improbable. He thought he had afterwards said to him that he had investigated the matter; but at all events, he told him that he was satisfied that there was no such mortgage. H. T. Williams, a member of the Sedalia bar, also testified that on November 24, 1890, he made a trip with Parmerlee to Benton county. Joe Minter was also on the same train, representing his firm—a number of Sedalia houses being interested in claims which they had against some firm in Benton county. Parmerlee referred to the fact of Minter being there in the interest of his own firm, and stated that those fellows (Minter Bros.) didn't like his (Parmerlee's) way of doing business, but that they could not afford to act that way towards "us, as attorneys;" that they (the attorneys) might be capable of doing them a great deal of good or a great deal of harm; and frequently, from time to time, Parmerlee inquired of Williams if he knew anything about the plaintiffs, and predicted that they were on their last legs and in a failing condition, and some time in the early part of December Parmerlee went to William's office and said, "Have you heard anything lately about the Minter Brothers?" and when Williams said that he had not, then Parmerlee stated, "I have heard that the First National Bank holds a mortgage on their stock, and will put it on record at the proper time, and outside creditors will be left," and he asked Williams if he knew anything about that. Williams told him that he did not, and they proceeded to discuss the Minter Brothers, and Parmerlee stated that they only had a stock of $20,000, and were very much involved, and that he had learned of the mortgage from a firm that knew of its existence, and said that he would send a report of the mortgage to The Bradstreet Company in that way in his report; and Williams told him that if he sent in that sort of a report, it would be the end of the Minter Brothers in business. After talking some considerable time with Mr. Williams, Parmerlee got up to leave, and as he went out he said: "I am going

to send a report in any way, God damn them, and they will be under the ground in ninety days, and you will see it.'' On another occasion, when Williams and Parmerlee were in the town of Lamonte, near Sedalia, on some business, they had another conversation, in which Parmerlee said, ''It will be a big old failure, and we will have some claims for collection.'' By the testimony of the plaintiffs and of the cashier of the First National Bank it was shown that there never had been any mortgage given by the plaintiffs to the First National Bank or to any other bank in Sedalia. C. D. Minter testified that early in December, after hearing that someone had started a report concerning him, he had an interview with Parmerlee, and Parmerlee said that he did not have anything to do with sending out the reports. Thereupon Minter asked him if he would send a telegram to The Bradstreet Company stating that the reports were false, and he promised to do so. That was along about the 9th of December, and he showed Parmerlee several telegrams that he had received from several firms, saying they had gotten some reports concerning ''Minter Brothers.'' Among others was a telegram from the firm of Hilton, Hughes & Denning, dated December 9th, to Minter Brothers saying, ''You are reported here as in trouble. Wire us the facts,'' which was followed by a letter, written the same day. Minter promptly wired them a statement of their affairs, and denying any ground for unfavorable reports, and in due course received a reply as follows: ''New York, Dec. 10, 1890. Messrs. Minter Bros., Sedalia, Mo. Gentlemen: We herewith confirm our telegram to you advising that you were reported as in trouble, and we have your reply, announcing your solvency, which we anticipated was the case. We have reported your wire to the various agencies, and trust the erroneous report will do you no injury. Yours truly, Hilton, Hughes & Denning, per J. T. Chapman.'' Chapman testified that he had received this telegram, and

that he had showed it to The Bradstreet Company, to correct their reports, and that he not only got a telegram directly from Minter Brothers concerning their condition, and showed it to defendant, but also received a copy of a telegram that Minter Brothers had sent direct to The Bradstreet Company. Minter also testified that when he heard of these reports about the 9th of December, in addition to telegraphing to Hilton, Hughes & Denning, he had telegraphed to The Bradstreet Company to the same effect, as previously stated, and also made a detailed statement of their affairs to Parmerlee along during December, when he interviewed Parmerlee with reference to some accounts that had been sent to Parmerlee for collection on account of the reports that had gone out, some of which claims were taken out of Parmerlee's hands when the parties learned how he had gotten them. The statement of the affairs of Minter Brothers, as prepared by themselves and Musgrave, attorney for J. V. Farwell & Co. of Chicago, showed assets largely in excess of, and indebtednesses much less than, those contained in the statement of December 22, 1890, issued by the defendant in connection with the statement to the effect that a local bank had been secured, etc. At first the plaintiffs thought the error had been corrected; but they soon learned that the damaging reports were being repeated, and they were neither able to buy goods on the usual terms to replenish their stock nor to secure any accommodation in regard to existing indebtedness; that the same was frequently being presented from day to day—some long in advance of its maturity. Plaintiffs continued to pay the claims as they were presented, although some of them were not due, and finally, in order to realize the money for that purpose, they sold a part of their goods at a great sacrifice, rather than to let any claim go back unpaid. This state of affairs continuing through the balance of December and into January, and plaintiffs desiring to fill up their stock for the spring trade, Charles Minter went

to New York, by way of Chicago. When he stopped at Chicago he took a letter of introduction to the manager of The Bradstreet Company there, and having secured an interview, made a full and complete statement of the financial condition of their firm and concerning their relations with Parmerlee, and fully advised him of the threats that Parmerlee had made, and showed him a letter written by Parmerlee with reference to the claim of a New York house; which Parmerlee had secured for collection, although not yet due; and Minter also showed to the Chicago representative of the defendant the letters of this New York house previously mentioned, and also the correspondence with Hilton, Hughes & Denning. Thereupon the Chicago representative promised to correct the reports which had been sent out, and to take the matter up with the New York office at once. He promised to straighten the matter through the St. Louis office. Minter then proceeded to New York, where he spent several days among the business houses in his line of business, and was much surprised and mortified to learn that no correction had been made, but on the contrary the same sort of reports as before seemed to be pursuing him. Accidentally he met with Thompson, the cashier of the bank which was said to have taken a mortgage on the stock of goods, who was in New York on some other business, and at Minter's request Thompson went with the former to the head office of the Bradstreet Company in New York, and explained fully to the manager of that company the relation between Minter Bros. and his bank, and assured them that the bank did not then have, and never had had, any mortgage or anything of that nature from Minter Bros. He also informed defendant at that time generally, concerning the financial condition and situation of Minter Bros. to the effect that they were entirely solvent. Minter supplemented this statement with information concerning the threats that Parmerlee had made, and thereupon the assurance was given by the defend-

ant's officers that they would hasten to rectify the wrong that had been done, and that Mr. Minter would find that he would have no farther trouble, and that he could approach the merchants in New York with the understanding that he would be put right before them. A few days later, when proposing to buy a bill of goods from a merchant named Wallis, he was again surprised to find that no correction had been made; and thereupon he stated to Wallis what had occurred in the office of The Bradstreet Company, and asked him to procure a new report, which he was satisfied would be all right. Wallis made a request for a report from the Bradstreet Company, and along about the 20th of February received a report dated December 22, 1890, being a duplicate of the one which he had previously received in December, and being the same in all respects as the one heretofore set forth as the basis of this action. The three requests for information concerning Minter Brothers, which were made by John Wallis & Co., upon the defendant were dated, respectively, December 9, 1890, December 17, 1890, and February 20, 1891. The requests made in December were in pursuance of a suggestion from The Bradstreet Company that if Wallis & Co. wanted to know anything about Minter Brothers, they had better call. The evidence of the requests for information and the fact that information was sent to Wallis & Co., in December, as well as the fact that requests were made by the various merchants who appear among the witnesses, and the fact that the defendant company sent reports in response to these requests, were all brought out by the defendant.

After the occurrence of the events in New York, which was in February, 1891, and about the first of March, the defendant issued a new statement, which it called "Substitute for Previous," concerning Minter Brothers (plaintiffs), as engaged in the business of wholesale and retail dry goods, carpets, etc., in Sedalia, Mo., and in Lamonte, Mo. (where they had a branch

house at the time). This report was dated March 2, 1891, and was followed by another, called "Additional," dated March 6, 1891. These reports were presented as a part of the testimony of Jesse G. King, the superintendent of the Chicago office of the defendant company, and were furnished by Bird, of counsel for defendant. From these reports of March 2 and March 6, 1891, it appears that the report of December 22, 1890, was false in every respect; and notwithstanding the statements previously made by the defendant in that report of December 22, 1890, and that in consequence thereof the plaintiffs had sacrificed a large amount of their assets in order to preserve their credit by taking up their paper as it was presented. The defendant by its statement of March 2nd presents a detailed statement of the assets and liabilities of the plaintiff, which at that time showed a net worth of $78,410.56; and in the report of March 6th stated that "they pay promptly, and we regard them favorably; that they stated to us a few months ago that they were worth about $60,000;" while the report issued by defendant under date of December 22nd only credited the plaintiffs with a net worth of $12,000.

Parmerlee was introduced as a witness on behalf of the defendant, and while he denied using the language and saying some of the things ascribed to him by plaintiffs' witnesses yet admitted the substantial part of it, and that he was unfriendly toward the plaintiffs. Nearly every point and question in the case was controverted.

The evidence on the part of defendant tended to show the following:

"In 1889, plaintiffs bought for their place of business the Ohio Street Methodist Church property in Sedalia, which had been converted into business property, and in August, 1890, they undertook to change its front from brick to stone, and make other improvements, at a cost of about $9,000. These changes seriously interfered with their business. On the 15th of November,

1890, a note of plaintiffs for $1,750, which they had given H. B. Claflin & Co., for goods purchased, was protested for non-payment.

"On December 9, 1890, inquiries by telegraph concerning plaintiffs' financial condition reached them.

"At this time plaintiffs owed Farwell & Co., of Chicago, between $10,000 and $12,000 and this firm sent their attorney, Musgrave,' to Sedalia and he took from plaintiffs a written statement of their condition. This statement is dated December 9th.

"In December, 1890, Wm. Parmerlee, an attorney at law, was a correspondent of defendant's at Sedalia, but defendant had no office there. The Dun Mercantile Agency then had a regularly organized office at that place under the management of Mr. Guy Cope. When Musgrave reached Sedalia he went to Dun's office. On the same day (December 9th) Hilton, Hughes & Denning, New York creditors of plaintiffs, wired them, 'You are reported here as in trouble. Wire us the facts.'

"Geo. M. Shelley, an adjuster for H. B. Claflin & Co., of New York, also went to Sedalia about this time to look into the condition of plaintiffs. The statement of this firm's account which he took with him was dated at New York, December 10, 1890, and showed over $4,000 in notes to be past due December 14th or 15th, the earliest date at which Shelley could have received it in Kansas City, and then taken it to Sedalia.

"C. D. Minter, on information, as he states, from Guy Cope, went to Parmerlee's office and accused him of having sent out false reports. This Parmerlee denied; but admitted that he had sent to defendant a report of the protested note.

"These inquiries, and activity, on the part of Minter Brothers' creditors disturbed them, and they consulted with Jas. C. Thompson, cashier of the First National Bank, and Messrs. Jackson & Montgomery, the bank's attorneys. They also began at once to advertise their goods for sale at manufacturer's cost, and on

December 21st their advertisements read: 'Our forced sale for cash will continue until further notice, dry goods, cloaks, notions, and carpets at cost. No goods will be charged.' Other advertisements to the same effect followed on December 2nd, 19th, 26th, 27th and 28th. There was no adverse action on the part of Minter Brothers' creditors after December 22nd, except the refusal of J. T. Wallis & Co., of New York, to sell them a small bill of goods except for cash. Everything done by their creditors was done between December 8th to 10th. At this time plaintiffs owed the First National Bank for money borrowed about $10,000; to merchants for merchandise some $30,000 of which at least $7,000 was past due, and their three pieces of real estate were mortgaged for $26,000, or more than half their aggregate purchase price. This real estate consisted of the building in which plaintiffs did business; 47 acres adjoining Sedalia, on which C. D. Minter lived, and a farm of 237 acres in Henry county.

"In 1891, plaintiffs incorporated their business. In January, 1893, this corporation made an assignment for benefit of creditors after securing by a chattel mortgage the First National Bank. Other creditors only got ten cents on the dollar.' The court below refused to allow plaintiffs to go the jury on the clause: 'They are behind and can not meet current indebtedness.'

"The statement to Musgrave, attorney for Farwell & Co., made December 9, 1890, showed that plaintiffs then owed on their real estate mortgages $26,000—$15,000 on their store building; $8,000 on the 47 acres near Sedalia, and $3,000 on the 237-acre farm in Henry county. For merchandise they owed $25,550.68, not then due, and $5,388.78 past due. It is admitted by plaintiffs that they owed the First National Bank of Sedalia, $8,000 or $10,000 on unmatured paper, though this statement does not show it. Possibly one of the $10,000 items put down as due Farwell & Co., should have been entered as due this bank. The total liabili-

ties as shown by this statement would then be $66,939.46.

"In a statement of December 17th, made to Griswold, Palmer & Co., of Chicago, plaintiffs put their past due debts at $3,500 with no money on hand.

"In his letter to Claflin & Co., November 15th, concerning the protest on that day of their note for $1,750, C. D. Minter explains their inability to take care of the note on the ground of unseasonable weather and a delay of thirty days in completing alterations of their store. The notations or indorsements on this letter show that plaintiffs at that time owed Claflin & Co. alone on past due notes $5,997.99; and that these notes, and one due the same firm December 1st, would aggregate $7,747.99. That these notations prove this appears from the statement of the account between plaintiffs and Claflin & Co., presented to plaintiffs about December 14th, by Mr. Shelley, and dated at New York, December 10th.

"This account showed, as did the notations on the letter just referred to, that two notes aggregating $2,-483.68 falling due in October, were still unpaid and that by December 17th plaintiffs would still owe this firm alone on past due notes $5,497.12.

"It also showed nearly $500 as past due on open account, and Shelley testified, and was not contradicted by plaintiffs, that they never paid about $2,000 of the indebtedness shown by this account.

"That plaintiffs in December, 1890, owed at least $5,000 or $6,000, and probably $7,000 or $8,000 of past due mercantile debts out of an aggregate of $30,000.

"Parmerlee, defendant's correspondent at Sedalia in 1890, admitted that he believed plaintiffs had given some sort of security to that bank, and expressed that opinion to defendant. And he gave as reasons for believing that the First National Bank had taken security his knowledge of plaintiffs' condition and the fact that Farwell's attorney had been there, and because he saw Thompson going with C. D. Minter to Jackson & Montgomery's office, and his conviction that if plaintiffs

got into trouble, they would take care of that bank. He also acknowledged that he wrote the substance of the report complained of. He also stated that this report was written on the day of its date, December 22, 1890, or the day before, and then sent to the St. Louis office of defendant King, superintendent of defendant's Chicago office, and whose deposition plaintiffs took and read in evidence, explained that the date on the lower right hand corner of a report (as for example, December 22, 1890, on the report in question), indicated the date at which the information was obtained, or the report formulated; and that the report, whenever issued to a subscriber, would carry this date on the lower right hand corner and the date of its issue on some other part.

"Parmerlee also stated that he believed plaintiffs had given a mortgage to the First National Bank, but he never reported to defendant that they had done so. Witness testified that if he had reported plaintiff as having given a chattel mortgage, he would have to make the report on a special blank form. This form would have required him to give, amongst other things, the amount of the debt, when payable, description of the property mortgaged, and date of the filing thereof.

"The notes held by the First National Bank were for the firm's indebtedness and yet were signed by the several partners by their individual names, as well as by the firm name of 'Minter Bros.' They were signed by Minter Brothers first, and then C. D. and Joe Minter individually."

Defendant also introduced evidence to show that the report complained of was only issued to its subscribers who were interested in the financial condition of plaintiffs, and in response to requests therefor, and for the exclusive information of such persons.

The court over the objection and exception of defendant instructed the jury as follows.

"1. The court instructs the jury that the plaintiffs' right to recover in this case depends upon and is

limited to the falsity and publication, as elsewhere explained, of the following clauses of the report, dated December 22, 1890, mentioned in the evidence, to-wit:

" 'The opinion is expressed that a local bank has been secured.

" 'Their present condition is not regarded as particularly flattering, and seems to suggest cash dealings.'

"While you should take into consideration the whole of said report, in order to ascertain the meaning and significance of said part of it, still the fact that the other parts of said report may be true, does not prevent the plaintiffs from recovering on said part, quoted above, if you find from the evidence that it was untrue; on the other hand the plaintiffs are not entitled to recover on account of the falsity of any part of said report other than the clauses above set forth.    Therefore, if you find from the evidence that the above mentioned part was false, and imputed to the plaintiffs insolvency, or conduct which would prejudice them in their business or trade, or be injurious to their standing and credit as merchants or business men, and was published as elsewhere explained, then the plaintiffs are entitled to recover damages to be estimated under all the instructions in the case.

"2.    The court instructs the jury that the matter set forth and quoted in the preceding instruction and contained in the report mentioned in the evidence as bearing date December 22, 1890, and headed, 'Minter Brothers, W. & R. D. G. Sedalia, Mo.,' was libelous in its nature, if it was untrue, and charged upon and imputed to the plaintiffs insolvency or conduct that would prejudice them in their business or trade, or be injurious to their standing and credit, as merchants or business men, and it constitutes a cause of action if it was published, unless it is shown to have been within the protection of the privilege set up by the defendant.    Therefore, if you believe from the evidence that the defendant did, on or about December 22, 1890, publish of and con-

cerning the plaintiffs as merchants in Sedalia, Missouri, the said report, and that the matter before specified was false and calculated to have the effect as explained above, then the defendant is liable to the plaintiffs for damages, unless you believe from the evidence in the case that said report was privileged.

" 'Publication', as here spoken of, is the preparation and delivery of a copy of the alleged libelous matter to some third person. To entitle the plaintiffs to recover, it is not necessary to prove the issue or publication of numerous copies of said report, and if you believe from the evidence that at a date prior to the institution of this suit, the defendant prepared and delivered a copy of said report to any firm, person or corporation, other than the plaintiffs themselves, then there was complete publication thereof in contemplation of law.

"The privilege claimed by the defendant is not absolute but qualified, and to entitle the defendant to the benefit of the same you must find from the evidence that defendant only issued and delivered said report to such persons, firms or corporations, as were interested in knowing the financial condition of the plaintiffs, at the time by reason of having had, or being about to have business transactions with plaintiffs, or who were subscribers of the defendant company, and had made requests upon defendant for information concerning plaintiffs, and that for such reasons, or any of them, defendant made and furnished said report in good faith, and unless you do so find, then said publication was not privileged; and the court further instructs you, that even if said report was only furnished to such persons above explained, still the same was not privileged, if you believe from the evidence that the same was prompted and accompanied by actual malice upon the part of defendant. 'Actual malice', as used in this connection, means that the report in question was prepared and published, not in good faith, but with intent to injure

plaintiffs, or with a willful and wanton neglect of the rights and interests of the plaintiffs, and if you believe from the evidence that there was such actual malice in the furnishing of the said reports, then the same was not privileged as claimed by the defendant.

"If for any reason as before explained, you find that the said report was not privileged, and if you also find it was published concerning the plaintiffs as merchants, and the parts above specified were false, and was calculated to have the effect above explained, and was published by defendants as before explained, then you should find the issues for the plaintiffs, and assess their damage at such sum as you think proper and just under the evidence and instructions in the case, not to exceed, however, the sum of one hundred thousand dollars.

"3.   The court also instructs you that the defendant being a corporation can only act through its officers and agents and is responsible for the willful, wanton, reckless or malicious acts of its officers or agents, done within the scope of their employment, and if you believe from the evidence that one or more of the agents and officers of the defendant who were engaged in furnishing said report of December 22, 1890, or in collecting or compiling the information for the same, were actuated by express or actual malice, or ill will towards plaintiffs, or acted with willful or wanton neglect of the rights of plaintiffs, or with a reckless disregard of the consequences of their acts and conduct, in the performance of the services imposed upon them by the defendant, in relation to said report, then the acts, conduct and motives of such officers or agents, in that regard, were the acts, conduct and motives of the defendant, and the defendant is chargeable with actual or express malice in respect to said report.

"5.   In reaching a conclusion as to whether or not the defendant through its agents, furnished as true reports the statements set forth in the other instructions, knowing them to be false, or furnished the same in order

to injure the plaintiffs, or with a willful neglect of the rights and interests of the plaintiffs, or with a reckless disregard of the consequences of the act, you may take into consideration ·all the facts and circumstances detailed in evidence, giving to each part thereof such weight as you think it is entitled to.

"6.    If you find for the plaintiffs under the other instructions the damages may be compensatory,·or punitive and compensatory.

"Compensatory damages are to be given when the evidence satisfies the jury that the plaintiffs have sustained material or substantial injury, and that such injury was the result of the wrongful act of the defendant, and compensatory damages should be a sum sufficient to compensate the plaintiff for such injury.

"Punitive damages are awarded for the purpose of punishing the defendant for the wrongful act, and setting an example before the community, but are not allowed unless the evidence is sufficient to satisfy the jury that in doing the thing complained of the defendant was actuated by feelings of ill will or hatred towards the plaintiffs or reckless disregard of the consequences of the act.

"7.    If you find for the plaintiffs, then, in assessing the damages, you are not restricted to the mere pecuniary loss, if any, which plaintiffs may have sustained by reason of the report complained of, but in addition thereto, you may inflict damages for example's sake, and by way of punishment of the defendant, and in estimating the same, you will take into consideration all the facts and circumstances detailed in evidence and award such damages as will be a compensation and adequate recompense for the injuries sustained, and such as may serve for a wholesome example to others in like cases—not exceeding, however, the sum of one hundred thousand dollars."

Before giving instruction No. 1, the court struck from it all reference to the clause:   "They are behind

and can not meet current indebtedness.''

At the instance of defendant the court instructed the jury as follows:

''5.    The court instructs the jury that plaintiffs complain that defendant published of and concerning them the following libelous things:

''First.    The opinion is expressed that a local bank has been secured.

''Second.    Their present condition is not regarded as particularly flattering, and seems to suggest cash dealings.

''Which they claim were each of them false, malicious and defamatory.

''The publication complained of consists in defendant giving out to others, papers containing said charges.

''Now, if you find from the evidence, that defendant only gave out such papers to such persons, or firms, or corporations as were interested in knowing the financial condition of plaintiffs at the time, by reason of having had, or being about to have business transactions with plaintiffs, or who were subscribers of defendant, and had made request upon defendant for information concerning plaintiffs, and that for such reasons, or any of them, defendant made and furnished such papers in good faith, then such publications were privileged, and do not sustain the allegations of plaintiffs' petition, and your findings must be for defendant unless plaintiffs have proven by the greater weight of all the evidence in this case, that defendant was actuated in making such publications by malice toward plaintiffs, as said term, malice, has been defined in other instructions.

''6.    Although one may publish of another defamatory and malicious matter, yet the truth of the matter published forms a complete defense to any action for damage for such publication; and in this case, even if the jury should believe from the evidence that defendant published of plaintiffs any or all of the matters charged as libelous, yet, if they further find from the evidence

that the matters so published were true as published, then the defense has been made complete, and in that case it is immaterial whether the party composing, or the party publishing, was or was not actuated by malice against plaintiffs, and you must find for the defendant.

"And if the jury find from the evidence that any one of the two allegations or charges are true, then, in arriving at the assessment of damages, they must not allow any damages on account of such charge so proven to be true.

"11. Even if the jury should believe from the evidence in this case, that William Parmerlee, who was at the time a correspondent of defendant company at Sedalia, Missouri, wrote any letters containing any damaging reports to Sweetzer, Pembroke & Company, of New York, yet this defendant is not liable in this cause for such act of said Parmerlee, or for any damages plaintiffs may have sustained thereby.

"14. The court further instructs the jury that the defendant is in nowise liable in this action for any misfortune that the Minter Dry Goods Company may have sustained, nor is defendant liable for any loss or damage that plaintiffs sustained, if any, by failure of that corporation, if it in fact failed.

"18. The court instructs the jury that if their finding makes it necessary for them to consider the question of damages, they must determine them not arbitrarily, but by the sound, temperate, deliberate and reasonable exercise of the functions vested in them by law, and they can not allow any damages sustained by plaintiffs on account of any derogatory reports put in circulation, or published by any one other than defendant.

"19. If the jury believe from the evidence that any witness has willfully, that is, intentionally, sworn falsely as to any material fact at issue in the case, then they are authorized to reject any portion or all of the testimony of such witness."

Vol 174 mo—31.

The following instructions were asked by defendant and refused, to which said refusal defendant duly excepted.

"1.   The court instructs the jury that, under the pleadings and all the evidence in the case, plaintiffs can not recover, and their finding should be for defendant.

"2.   The court instructs the jury that the plaintiffs can not recover in this action on account of the charge: 'They [meaning plaintiffs] are behind, and can not meet current indebtedness.'

"3.   The court instructs the jury that plaintiffs can not recover in this action on account of the charge: 'The opinion is expressed that a local bank has been secured.'

"4.   The court instructs the jury that plaintiffs can not recover in this action on account of the charge: 'Their present condition is not regarded as particularly flattering, and seems to suggest cash dealings.'

"7.   The court instructs the jury that if they believe from the evidence in this case that any of the matters charged against the defendant were true at the time they were alleged to be published, then the jury will find for the defendant on the whole case.

"8.   The court instructs the jury that if they believe from the evidence that the words, 'They are behind,' meant in the report complained of that plaintiffs owed past due debts, they can not recover because of such words in said report.

"9.   The court instructs the jury that if they believe from the evidence that the words, 'Can not meet current indebtedness,' meant in the report complained of that plaintiffs could not pay as it matured in the usual course of business, indebtedness then maturing, then plaintiffs can not recover because of such words in the said report.

"10.   The term 'malice' as used in this case, does not mean mere spite or ill will as commonly used and

understood, but is a state or condition of the mind that shows one to be void of all social duty, and fatally bent on mischief, and is shown by the willful doing of a wrongful act without just cause or excuse therefor.

"12.   The court instructs the jury that if they believe from the evidence the words, 'They are behind and can not meet current indebtedness,' meant in the report complained of. that plaintiffs owed past due debts, then plaintiffs can not recover damages for such words in said report.

"13.   This defendant can not be held liable in this case for any damages that plaintiffs suffered, if they find they have suffered any, unless the same were the direct and immediate result of defendant company formulating in its St. Louis office the matters here sued for as libelous, and publishing the same to others.

"15.   The court instructs the jury that if they find for plaintiffs in this action and allow them both compensatory and exemplary damages, as those terms are defined in instructions given, they must state the amount of such damages separately.

"16.   The court instructs the jury that in this action plaintiffs are not entitled to recover exemplary or punitive damages.

"17.   The court instructs the jury that the plaintiffs are not entitled to recover in this action as compensatory damages more than nominal damages, that is to say, if the jury find for plaintiffs, they must not allow as compensatory damages more than $1.

"20.   The court instructs the jury that a repetition or republication of the report complained of in this case, if it was repeated or republished, is not evidence in this case that any of the publications of said report were maliciously made."

It is insisted that the court committed error in refusing to instruct the jury that plaintiffs could not recover upon the ground of the allegation in the petition that "the opinion is expressed that a local bank has been

secured," whether that allegation is to be taken as meaning that plaintiffs had given security to a bank, or merely that defendant's correspondent thought they had. We are of the opinion that the instruction was properly refused for reasons hereafter stated. Certainly there was no evidence whatever that plaintiffs had secured the bank by chattel mortgage.

J. C. Thompson, cashier of the bank, testified, and, there was no evidence to the contrary, that plaintiffs were indebted to the bank in the months of November and December, 1890, by the way of loans in about ten thousand dollars, which were evidenced by several notes and secured by the individual signatures of Minter Brothers. That the bank had no other security, directly or indirectly; that the paper was signed first by Minter Brothers, and also by C. D. Minter and Jo. Minter, the members of the firm individually; and that there was no arrangement by which the deposits of the firm were to be applied in satisfaction of those loans, or understanding, either directly or indirectly, by which they were under any circumstances to give other security, or make other arrangements to better secure them; that none of the notes were due at the time the Claflin & Co. note was protested, but they became due thereafter and were renewed with the same security as before. It is too plain for argument that Parmerlee did not have reference to the notes secured by personal security when the loans were made, but that he intended to convey the impression that the indebtedness of Minter Brothers to the bank had been secured by the execution of a chattel mortgage on their personal property, after the notes or some of them were executed. Indeed, he testified as a witness that he believed the bank had been secured by chattel mortgage. Nor is it any defense to this action that he thought they had done so. We agree with counsel for the defendant that when the firm of Minter Brothers borrowed money from the bank for the use and benefit of the firm and executed notes to

secure the payment thereof in the firm name, that when they added their individual names to such paper they became sureties on such paper, but that such was not the kind of security to which Parmerlee had reference, nor could it have been so understood, for such occurrences are but common everyday business transactions in which all merchants and business men as a rule indulge, and if published would create no unfavorable impression of financial standing, but to publish of such person, as was done of the plaintiffs in this case, that "the opinion is expressed that a local bank has been secured" is quite a different thing, and imputed to them a want of credit, responsibility or insolvency which necessarily and presumptively could but have caused them pecuniary loss and, therefore, was actionable *per se*.

In the case of Weiss v. Whittemore, 28 Mich. 366, the Supreme Court of that State say: "The definition of a libel, as given by Mr. Townshend upon a review of the authorities is, that it is a wrong done by writing or effigy, and if false and malicious, certainly, and for the purpose of injuring another in reputation, trade, employment or property, every publication of language concerning a man or his affairs, which, as a necessary or natural proximate consequence, occasions pecuniary loss to another, is prima facie a libel, if the publication be by writing."

A definition of libel, as quoted and approved by this court in Nelson v. Musgrave, 10 Mo. 648, is: "A malicious publication, expressed either in printing or writing, or by signs or pictures, tending either to blacken the memory of the dead, or the reputation of the one who is alive, and expose him to public hatred, contempt or ridicule." This definition has been cited with approval in Price v. Whitely, 50 Mo. 439 and Legg v. Dunleavy, 80 Mo. 563. "Any printed publication that tends to bring a man into disrepute, ridicule or contempt is a libel in a legal sense."

In the case of Hermann v. Bradstreet Company, 19 Mo. App. 227, it was held that the following words: "Joseph Hermann, brickmaker, is in the hands of the sheriff," which were published of and concerning Hermann who was engaged in the business of brickmaking, were libelous and actionable *per se*. Words written or spoken of one's trade are actionable when they might not be so if spoken of the individual simply. [Townshend on Slander and Libel, sections 132-179.]

Every willful and unauthorized publication, written or printed, which imputes to a merchant or other business man conduct which is injurious to his character and standing as a merchant or business man, is a libel and implies malice. [Locke v. Bradstreet Co., 22 Fed. 771.]

So it was held in the case of Newell v. How, 31 Minn. 235, that, "in those trades or professions in which, ordinarily, credit is essential to their successful prosecution, as, for example, that of merchant, language is actionable *per se* which imputes to one in such trade or profession a want of credit or responsibility, or insolvency, past, present or future. Such language necessarily or naturally and presumptively, causes pecuniary loss to the person of whom it is published." [See, also, McGinnis v. Knapp, 109 Mo. 137; Mitchell v. Bradstreet, 116 Mo. 226.] This case is bottomed upon express malice in the publication of the libelous matter, which the evidence tends to prove, and which, if true, entitles them to punitive or exemplary damages. [18 Am. and Eng. Ency. of Law (2 Ed.), 999.]

But in "order for such a recovery to be proper there must be some proof of actual or express malice, or at least of such recklessness or carelessness on the part of the defendant as is equivalent to an actual intent to violate the rights of others." [18 Am. and Eng. Ency. of Law (2 Ed.), 1093.] In case the publication is only a qualified privilege, as in the case at bar, the "party defamed may recover notwithstanding the privilege, if

he can prove the words used were not used in good faith, but that the party availed himself of the occasion willfully and knowingly for the purpose of defaming the plaintiff." [Newell on Libel and Slander (2 Ed.), p. 475; Finley v. Steele, 159 Mo. 299.] Under such circumstances there can be no privilege, even though the libel may be true. [Wharton v. Wright, 30 Ill. App. 343; Hollenbeck v. Ristine, 105 Iowa 488; State v. Burnham, 9 N. H. 39; Lowry v. Vedder, 40 Minn. 475.]

And the fact that defendant's agent may have believed at the time of making the report that it was true, affords no defense to the action, unless made without malice. [State ex rel. v. Lonsdale, 40 Wis. 348; Locke v. Bradstreet Co., 22 Fed. 771; Erber and Stickler v. Dun Co., 4 McCrary 160.]

It is also said that whether the bank had security or not, was a question of law under the admitted facts and the court erred in submitting that question to the jury. If we are correct in what we have said that there was no evidence that the bank had a chattel mortgage, and that was the only security to which Parmerlee had reference when he made the report to defendant with respect thereto, there was no reversible error in submitting that question to the jury, although it may have been a question of law. Suppose the court had told the jury by an instruction in so many words, as it clearly had the right to do under the evidence, that there was no evidence before them that the bank had been secured by chattel mortgage, would it be contended that the instruction was erroneous? We apprehend not. The evidence being all one way upon this proposition it is impossible to conceive how defendant was prejudiced by the submission of it to the jury.

The other allegation in the petition is that, "their present condition is not regarded as particularly flattering, and seems to suggest cash dealings." Defendant says that the first question suggested by this clause is: What was plaintiff's condition? Then proceeds to

argue with much ability and ingenuity, and to cite authorities to show, that plaintiffs were insolvent at the time of its publication, and therefore the court should have instructed for a nonsuit.

Among the defenses of defendant as shown by its answer was that of justification; that is, that the imputations alleged to have been cast against plaintiffs by this publication that they were threatened with insolvency, were about to fail and were unworthy of credit, were true, and the burden was thereby cast upon it to show by a preponderance of the evidence that plaintiffs were insolvent at the time of the publication. This question was not, however, submitted to the jury, but we are asked to review the evidence and reverse the judgment upon the ground that there was no evidence to entitle plaintiffs to a recovery, or in other words, to take the case to the jury. To this contention we can not agree. Without again repeating in detail the facts disclosed by the evidence with respect to the assets of plaintiffs, their liabilities, and their ability to meet their debts as they became due, we are of opinion that it was sufficient to take the case to the jury upon the question of their insolvency, especially when we consider that the burden was' upon defendant, after plaintiff made proof of the publication of the libelous matter, under its plea of justification, to show that the publication was true.

The court refused to instruct the jury at defendant's request that if they found for plaintiffs and allowed both compensatory and punitive damages, the amount of each should be separately stated in the verdict, and in this ruling defendant contends committed error. This contention is based upon the Act of 1895 (Laws 1895, p. 168), now sections 594 and 595, Revised Statutes 1899.

These read as follows:

"Sec. 594. In all actions where exemplary or punitive damages are recoverable, the petition shall state

separately the amount of such damages sought to be recovered.

"Sec. 595. In all actions wherein such damages are recoverable and are allowed by the jury, the amount thereof shall be separately stated in the verdict."

This action was pending at the time the act was passed, and it is clear, we think, from the phraseology of the act, that it was not intended, and does not in fact apply to such actions, but only to actions thereafter instituted. It uses the word *shall* in both sections which ordinarily applies to something to be done or to take place in the future. In section 594, the words used are "the petition shall state," etc., and in section 595, that the amount of the verdict when exemplary or punitive damages are allowed by the jury "*shall* be separately stated in the verdict." They clearly have reference to actions thereafter to be brought, otherwise the lawmakers would have used some manner of expression indicating that it was to apply to actions then pending. If the act was intended to apply to actions that were pending at the time of its passage in which exemplary or punitive damages are recoverable and the petition should fail to state, as in the case at bar, the amount of such damages sought to be recovered, the plaintiff would be placed in the anomalous position of being compelled to ask instruction as to such damages when not in accordance with the averments in the petition, and thus by his own action invite error, which would be doing violence to the very spirit and purpose of the act. But when applied to actions brought after the passage of the act, and the petition is framed in accordance therewith, there can be no trouble in framing instructions in accordance with its purpose, and in perfect harmony therewith.

Moreover, there is nothing in the act which indicates that it was intended by the Legislature to apply retrospectively or, in other words, to actions then pending, and it has always been held by this court that a

statute is to be construed prospectively unless the intent that it is to be construed retrospectively is clearly expressed on its face.    [Leete v. Bank, 115 Mo. 184; State ex rel. v. Auditor, 41 Mo. 25; State ex rel. v. Ferguson, 62 Mo. 77; Thompson v. Smith, 8 Mo. 723; State ex rel. v. Hays, 52 Mo. 578; Reed v. Swan, 133 Mo. 100; Bartlett v. Ball, 142 Mo. 28; Shields v. Johnson County, 144 Mo. 76.]

It was also held by the St. Louis Court of Appeals in the case of Lamberson v. Long, 66 Mo. App. 253, that the statute in question does not govern a cause instituted before, though tried after it went into effect. Citing:    State v. Ross, 49 Mo. 416; Thompson v. Lyon, 33 Mo. 219; Powers v. Kueckhoff, 41 Mo. 425.

Defendant, however, relies upon, and cites, a number of acts of the Legislature and decisions of the appellate courts of this State as holding otherwise, but an examination of them will show that they are distinguishable from the case at bar in that they are in respect to matters of procedure not involving the necessity of the amendment of a petition in an action brought before the passage of the act in order to meet its requirements, and to enable the plaintiff to recover compensatory or punitive damages, when it was entirely unnecessary at the time the petition was filed, as in this case.

Another insistence is that the court erred in that it instructed the jury at plaintiffs' request for a recovery, and yet did not instruct on the issues made by the plea in mitigation of damages.

It has been said that mitigating circumstances serve only to reduce the damages; they can not therefore constitute a defense to the action.    [Atteberry v. Powell, 29 Mo. 429.]    And the statute is to the same effect.    [Sec. 2081, R. S. 1889.]    And defendant having pleaded certain facts for the purpose only of reducing the amount of recovery, if the instruction given at the instance of plaintiffs upon that phase of the case was not satisfactory, it should have asked such instructions

as the facts and circumstances seemed to require. It is not the duty of the trial court to give instructions in any civil case unless requested to do so.

In Tetherow v. Railroad, 98 Mo. 74, it was claimed that the defendant was entitled to a reduction of the damage by reason of mitigating circumstances. That was an action for the death of a party under section 2123 of the revision of 1879, now section 2866, Revised Statutes 1899, which provides that there may be a recovery of damages not exceeding $5,000 as the jury may deem fair and just, "having regard to the mitigating or aggravating circumstances." Necessarily in that case the defendant had the right to plead and prove any circumstances in mitigation of damages.

The plaintiff's instruction upon the measure of damages in that case read as follows:

"The jury are instructed that if you find for the plaintiff, you may, in your verdict, give her such damages, not exceeding five thousand dollars, as you may deem fair and just under the evidence in the case, with reference to the necessary injury resulting to her from the death of her husband."

The same point urged in this case was expressly made in that case, namely, that the instruction was defective because it did not direct the jury to consider the mitigating circumstances.

The court, in disposing of that matter, said:

"The instruction given by the court in regard to the measure of damages was correct as far as it went. Plaintiff was entitled (under our statute on the subject) to recover such damages as the jury might 'deem just, with reference to the necessary injury resulting from such death,' not exceeding five thousand dollars. [R. S. 1879, sec. 2123.] If defendant's counsel thought, as is now claimed, that there were circumstances mitigating the damages, that question should have been presented to the trial court by an instruction embodying that idea. This was not done. The court is not required in a civil

action to instruct the jury on questions of law not suggested at the time by the parties or counsel.''

Browning v. Railroad, 124 Mo. 55, was an action under the same statute as in the previous case. The point was expressly made that the jury were not properly instructed as to the measure of damages. The court said:

''Touching the measure of damages, the following expression of opinion, prepared by my learned brother, GANTT, is approved and adopted, namely:

'' 'The instruction on the measure of damages is also assailed as error. The instruction was in these words: ''If the jury find for the plaintiff they will assess her damages at such sum as in their judgment will be a fair and just compensation to her for the loss of her husband, not exceeding the sum of $5,000.'' The defendant asked no instruction on the measure of damages whatever. No attempt was made by it to point out the proper elements of damage in such cases or to modify the general language of the instruction. The instruction is not erroneous in its general scope; and if, in the opinion of counsel for defendant, it was likely to be misunderstood by the jury, it was the duty of the counsel to ask the modifications and explanations, in an instruction embodying its views. The court is not required in a civil case to instruct on all questions, whether suggested or not, and as there is nothing in the amount of the verdict to indicate that the jury were actuated by any improper motive in their assessment, the general nature of the instruction is no ground for reversal.' ''

In Barth v. Railroad, 142 Mo. 535, a similar objection to the one now urged, was made, and in disposing of it, this Division, Judge GANTT speaking for the court, said:

''We are thus brought to the consideration of instruction 4 on the measure of damages, given at the instance of plaintiff, already reproduced at length in

paragraph 4 of this opinion. The jury were instructed that if they found for plaintiff, they would award her 'such damage, not exceeding $5,000, as you may deem fair and just under the evidence in this case, with reference to the necessary injury resulting to her from the death of her husband.' This instruction was approved in Browning v. Railroad, 124 Mo. 55, and Boettger v. Iron Co., 124 Mo. 87. McGowan v. Steel Ore Co., 109 Mo. 518, is relied upon to convict the circuit court of error. The contention of the very able and learned counsel for defendants in that case was only for an instruction in the words of the instruction here complained of. Subsequently we ruled, in the Browning case, where the essential elements of the damages were given to the jury for the plaintiff in the language of the statute, its generality would not constitute reversible error, reserving to the defendant the right to point out the elements limiting damages in its own instructions. Following that case and the Boettger v. Iron Co. case, in the same volume, this instruction must be held not to constitute error.''

So in Robertson v. Railroad, 152 Mo. 382, it was observed:

''Plaintiff's third instruction is also criticised on the ground that it furnished the jury no guide by which to estimate the damages plaintiff was entitled to recover in the event of their finding for her; besides, it authorized a recovery for medical expenses when none were proven. We see no objection to the instruction except that part of it which authorized a recovery for medical expenses, to which our observations with respect to the admission of evidence upon that question applies with equal force to the instruction. With this exception the instruction is good as far as it goes, and if defendant desired to restrict plaintiff's right to recover to more limited grounds than was done by the instruction, it should have asked an instruction to that effect. [Brown-

ing v. Railroad, 124 Mo. 55; Matthews v. Railroad, 142 Mo. 645; Barth v. Railroad, 142 Mo. 535.] ''

In the case of Gray v. McDonald, 104 Mo. 303, this court, in speaking upon a similar question, said:

''The objection that the instruction did not allow the jury to take into consideration mitigating circumstances has no merit, for not a single circumstance was withdrawn from their consideration. Under it they were obliged to consider all the circumstances, even in awarding exemplary damages.'' .

It follows that in so far as what we have said may appear to be in conflict with Callahan v. Ingram, 122 Mo. 355, that case is disapproved.

What has already been said, and the cases already adverted to, really dispose of the specific contention to the effect that the court gave a ''roving commission to the jury as to damages.'' The two cases relied upon by the appellant are Hawes (not Harris) v. Stock Yards Co., 103 Mo. 60, and McGowan v. Ore & Steel Co., 109 Mo. 518. The first of these cases was for personal injuries, and the jury were told that they could return a verdict in such sum as they believed would compensate the plaintiff for his injuries. There was nowhere in the case anything to indicate what were the proper elements of compensation, nor was the jury in any place bound to a consideration of the facts and circumstances established by the evidence. The court expressly pointed out wherein that particular instruction failed to come up to the standard of the instructions in Waldhier v. Railroad, 87 Mo. 37, and Tetherow v. Railroad, 98 Mo. 74; and we submit that the instructions approved in both of the last-mentioned cases were much less favorable to the defendant than are the instructions in the case at bar. Again, the case of McGowan v. Ore & Steel Co., 109 Mo. 518, was considered by this court in Barth v. Railroad, 142 Mo. 535, where it was denied the effect now claimed for it by appellant's counsel, the court stating that it was only claimed in that case that

the instructions should have conformed to the standard afterwards said to be the correct one in the case of Browning v. Railroad, 124 Mo. 55.

The point is made that the court also erred in refusing to instruct the jury, as defendant requested, that plaintiffs could not recover because of the clause: "They are behind and can not meet current indebtedness." This alleged ground of action was eliminated from the case by the refusal of the court to let the jury pass upon it, and how defendant could have been prejudiced by this course we are unable to perceive. If either party was aggrieved by this ruling it was the plaintiffs, not the defendant.

It is also contended that the court erred by assuming in plaintiffs' instructions the falsity of the report, and especially the clauses thereof complained of as libelous, and that defendant knew them to be false. But this contention we think without merit. Instruction numbered 1, however, is challenged upon the further ground that it makes no mention of defendant's defense of privilege; and has no reference in itself to any other instruction upon this point, and that the only reference to other instructions is limited as to the publication, "as elsewhere explained," and to "damages to be estimated" under all the instructions in the case. The argument is that "the instruction directly requires the jury to find a verdict for the plaintiffs, and against the defendant, if they find that the phrases of it were untrue and imputed insolvency or conduct which would prejudice them as stated in the instruction, and was published."

It is not necessary that an instruction should refer to another, or that the issues involved in a case should be presented to the jury to be passed upon in one instruction, but if the instructions taken as a whole present the issues fairly, and are not calculated to mislead the jury, they are all the law requires. [Muehlhausen v. Railroad, 91 Mo. 332; Henry v. Railroad, 113 Mo.

525.]    Nor is it open to the objection that it assumes as true controverted facts.

Besides, by the second instruction given for plaintiffs, defendant's rights and duties under its defense of qualified privilege are fully covered.

Plaintiff's instruction numbered two is criticised upon the ground that it takes from the jury the question of which, under the Constitution, they are made the judges, that is, whether the publication complained of was libelous.    But defendant did not ask an instruction upon this phase of the case, nor is any such question raised in the motion for new trial, and must therefore be considered as waived.    This same question was before this court in Mitchell v. Bradstreet, 116 Mo. 226, and it was held, that while section 14, article 2, of the Constitution provides that "in all suits and prosecutions for libel the truth thereof may be given in evidence, and the jury, under the direction of the court, shall determine the law and the fact," as "no instruction of this character or presenting this phase of the case to the jury was asked by the defendant," and as the trial court is not required in civil cases to give instructions when none are asked by the parties, no error was committed in its failure to do so.    That it is proper for the court to so instruct the jury in libel cases when requested to do so, may be conceded (Arnold v. Jewett, 125 Mo. 241), but no such request was made in this case.    Moreover, as the question was not raised in the motion for new trial, it can not be raised here for the first time.

The instruction is criticised upon the further ground that it incorrectly defines actual malice.    It says, "Actual malice, as used in this connection, means that the report in question was prepared and published, not in good faith, but with an intent to injure plaintiffs, or with a willful and wanton neglect of the rights and interest of the plaintiffs."    We see no substantial error in this definition.    Malice in legal understanding, implies no more than willfulness, that is, intentional.    In

Buckley v. Knapp, 48 Mo. 152, it is said: "Whilst malice in common acceptation means ill will toward some person, in its legal sense it is defined to be a wrongful act done intentionally without legal justification or excuse; and in ordinary actions for slander or libel, malice in law is sufficient, and it is to be inferred from the publication of the slanderous matter without such justification or excuse. In most instances where an injury is committed against the person or property of another, the actual intention of the author of the mischief is immaterial. The law considers every one whose neglect, carelessness and want of due regard for the rights of others occasions injury to them, equally culpable and bound to make reparation to the extent of such injury as one who willfully does the mischief. It can make no difference to the party injured whether the injury was occasioned by a willful act or by negligence or a careless disregard of his rights, and such a consideration ought not to affect the remedy."

Defendant insists that the instructions rendered it liable, without qualification, for the malice of its correspondent. This insistence is predicated on the idea that malice was restricted to the defendant's agent, Parmerlee, at Sedalia, but this view is incorrect. While his was the initial or primary malice, yet the conduct of the managing officers of the company was such as renders each of them subject to the charge of malice; that is, either an actual, positive intention of injuring the plaintiffs or acting when they knew, or had good reason to believe, that the statements they were making were untrue, and yet persisted in making and repeating them, regardless of the injurious effect which they knew such statements would have upon the plaintiffs and their business standing. That a corporation is responsible in its corporate capacity for acts done by its agents, either *ex contractu* or *in delicto,* in the course of its business and of their employment, is well-settled

law. [Railroad v. Quigley, 21 Howard 207; Fogg v. Railroad, 148 Mass. 513; Townshend on Slander and Libel, pp. 470, 475.]

Defendant complains of the action of the court in permitting plaintiffs' attorney, over the objection of defendant, to read to the jury in his closing argument what its counsel assert was an opinion of the Supreme Court of Michigan rendered in a libel case, entitled Pollasky v. Menchener. With respect to this contention the record shows that the following occurred:

During the argument Geo. P. B. Jackson, one of the plaintiffs' attorneys, before the jury, in connection with some general remarks upon the nature of the business of reporting agencies and its effect upon others, said in substance:

"I have noticed in the course of my reading some remarks in a magazine concerning commercial agencies which express my views better than I can do myself, and, as I have not attempted to commit those remarks to memory, I will read them from the publication."

And thereupon he read from the pamphlet which he held in his hand the following portions:

"Consider for a moment the relation of the mercantile agency to its subscribers. It undertakes to furnish them, for a consideration paid in advance, such information relative to the responsibility and credit of merchants and others as it obtains from its subagents, servants and correspondents, without guaranteeing the accuracy, reliability, or correctness of such information or being responsible for any loss caused by the neglect of its agents and servants or for their want of verity. It expressly stipulates that it will not reveal to such subscribers the sources of its information, nor the names of the persons from whom they received it, and requires a pledge from the subscribers that they will never, under any circumstances, communicate to the persons reported the information received concerning them from the mercantile agency. It also adopts measures to pre-

vent the particular communities from ascertaining the name or identity of the person reporting the standing of business men in that community.    These secret and inquisitorial agencies ramify every part of the United States and the Dominion of Canada, and possess the power of destroying with falsehood or calumny the credit of any business man in the country, and of bringing him to bankruptcy and ruin. To hold such vast inquisitions exempt from liability for false publications respecting the character and standing of a business man would be to sanction the highest injustice.   The business man's integrity, his reputation for fair and honest dealings, his prosperity in the transaction of his business, are of the utmost importance to him, and are oftentimes his best capital with which to carry on his business.    Commercial credit is based upon confidence, and all know upon how frail foundations commercial confidence is builded. A breath of suspicion may destroy it. Confidence is withdrawn, and the party is ruined.    And so, in a broader field, a breath of suspicion is directed against the public credit, suspicion gives place to rumors of disaster, rumors disseminated undermine the general confidence, and panic is the result.   On the other hand, these same commercial agencies, which always have their fingers upon the business pulse of the country, are a potent factor in keeping up public confidence.    They issue their manifestos of encouragement, and scatter them broadcast over the land.    They are read by the business men of the country. The newspapers assist the circulation among all classes of people, the public confidence is strengthened, or at least, fears of disaster are allayed.    In this they exert a strong influence for good, and are recognized institutions in carrying on the business of the country,   But they are also potent for evil to the individual.   They send out their notification sheets containing a false statement respecting a particular person and he is undone—no one will trust him, and all claims are pressed for immediate

payment. His business character is sullied, confidence is withdrawn, and his business career has received a blow which it will require a long time to repair. . . . "It is all very well to advance the interests of the wholesale dealers as a class, and afford them information which will reasonably protect them from loss. But there is no principle of justice or of law which requires this to be done at the expense of the individual. It would be a harsh and tyrannical rule that would protect one person from loss at the pecuniary ruin of another. The welfare of society does not require that a few great wholesale dealers shall thrive by the sacrifice of the many or of any small purchasers."

After he had read a portion of said matter, one of the counsel for defendant arose and stated in the presence of the jury that they objected to the attorney for plaintiffs reading law to the jury. Thereupon plaintiffs' said attorney stated to the court and to defendant's counsel, in the presence of the jury, that he did not claim to be reading from a law book, and had not so stated; that he understood that under the Constitution of this State the jury in a libel case were the judges of the law and the evidence, and it would be entirely competent, if he desired to do so, for him to read to the jury from any law book, but that he did not propose to read any law to the jury, and only intended to read some general comments upon the character and effect of the work of commercial agencies, because he could not remember the language used by the author from which he read, and that he only read it because he had not committed it to memory, just as he might read poetry which he could not memorize. No mention was made by anyone concerning the nature or name of the publication from which the extract was read, nor the name of the author, or of the occasion upon which the matter was prepared or published. At that time the judge did not know what was being read from, nor was there anything to indicate that the jury knew, neither did the defend-

ant's attorneys state the nature, author or occasion of the publication read from, or give any intimation that they knew what it was, farther than the general statement that they objected to plaintiffs' attorney reading law to the jury. Whereupon the court remarked, in substance, that he would not go to the extent suggested by plaintiffs' attorney and hold that it was permissible to read law to the jury; that so far it did not appear that he had done so, and the court assumed that the attorney upon both sides knew what was proper in the argument of the case, and in view of the statement of the plaintiffs' attorney, the court did not anticipate that the attorney would transcend the proper limit, and if the defendant's attorneys thought that he did, they could bring the matter to the attention of the court.

Thereupon the attorney for plaintiffs concluded the reading of the extract above set forth.

It does not appear from the record that the attorney claimed or pretended that he was reading any law to the jury, nor was there any principle of law discussed in it, but simply criticisms upon the manner and methods of conducting the business of commercial agencies, and their effect upon merchants and business men who happened to be unfavorably reported by the agents of such institutions. It was not read from a book nor was there anything about it that would indicate that it was a book. The attorney reading it did not call it a law book, but a magazine. The judge himself did not gather from what transpired that the attorney was reading law to the jury, and when defendant objected to the further reading of it, ruled that it was not a law book.

Appellant relies upon the case of Heller v. Pub. Co., 153 Mo. 205, as an authority for the statement that it was error to permit an attorney to read law to the jury. That was a case where defendant's attorney in a libel suit insisted that the jury were the judges of the law as well as of the facts, and that, therefore, he was

entitled to read the law of libel to the jury, and when he undertook to do so objection was made by the plaintiff, and the court refused to permit the defendant's attorney to read from the law book as he had proposed.

The court said: "Whatever may be the practice in other States, it is not permissible in our State to read law books to a jury in any kind of a case, and the trial court did not err in stopping counsel for defendant in this case, when he attempted to do so."

That there are many cases in which it has been held that it is not reversible error to refuse to allow an attorney to read law to the jury may be conceded; upon the other hand, there are many instances where appellate courts have refused to reverse judgments because the trial court permitted law to be read. The general rule as announced by the authorities is that it is a matter resting largely within the discretion of the court whose function it is "to instruct the jury upon the law, and where counsel undertake to read the law to the jury, the judge may properly interpose to prevent it; but if the judge sees fit to permit this to be done and the law is correctly laid down in the decision or book used by the counsel, it would not, we think, constitute legal error, or be ground of exception by the other party, although such a practice is not to be encouraged." [Williams v. Railroad, 126 N. Y. 96; 19 Am. and Eng. Ency. of Law (1 Ed.), 620, 624; 2 Elliott's General Practice, sec. 694; Proffatt on Jury Trial, sec. 251; Legg v. Drake, 1 Oh. St. 286; Cory v. Silcox, 6 Ind. 39; Harvey v. State, 40 Ind. 516; Kenyon v. Sutherland, 3 Gil. (Ill.) 99; Tuller v. Talbot, 23 Ill. 357; Regina v. Courvoisier, 9 Car. & P. 362; Steffenson v. Railroad, 48 Minn. 285; Railroad v. Lamothe, 76 Tex. 219; Gregory's Admr. v. Railroad, 37 W. Va. 606.] In all of these cases whatever was read to the jury was read as law by which they were to be guided in their deliberations, and, as the law announced in those cases was in harmony with that laid down by the court in each particular case, none of the

judgments were reversed upon the ground of law books having been improperly read to the jury, though the practice was generally disapproved of. But in the case at bar the extract which was read was not read as law, but as preliminary to its reading counsel said: "I have noticed in the course of my reading some remarks in a magazine concerning commercial agencies which express my view better than I can do myself, and as I have not attempted to commit those remarks to memory, I will read them from the publication," and then proceeded to read a considerable portion of it before an objection was interposed.

Upon the interposition of the objection the court said that he "would not go to the extent suggested by the plaintiff's attorney and hold that it was permissible to read law to the jury; that so far it did not appear that he had done so, and the court assumed that the attorneys upon both sides knew what was proper in the argument of the case, and in view of the statement of the plaintiff's attorney, the court did not anticipate that the attorney would transcend the proper limit, and if the defendant's attorneys thought that he did, they could bring the matter to the attention of the court."

The reading of the extract was then continued without further objection.

It can not be said that counsel did not have a perfect right to have committed the article to memory and then to repeat it to the jury as part of his argument, which would be just as objectionable but for the fact that reading it in print might attach to it more significance in the minds of the jury.

And since it was used solely by way of argument and illustration, was not offered as presenting any statement of the law of the case, and in fact does not do so, and was in perfect accord with the law of the case as presented by the instructions, we are of the opinion that it was not prejudicial to the defendant, and that the judgment should not be reversed upon that ground

alone, though we do not think the practice is to be commended or encouraged.

There is no merit in the contention that the verdict is *against* the evidence, and we deem it unnecessary to say more in respect to that matter. But it is insisted that "the verdict is grossly excessive, and the result of passion and prejudice against the defendant." It is true the verdict is large, but it is the second one in the case. The evidence showed that plaintiffs were, at the time of the publication of the libelous statements, merchants in good standing, and credit, and doing a large and prosperous business, and, as a result of these reports, their credit and standing were ruined, their business wrecked and they were driven out of business. It also showed that the statements were conceived in malice, and so continued to the end of plaintiffs' financial ruin. The verdict was approved by the court who heard the evidence. Under these circumstances should it be disturbed by this court? We think not.

In Pritchard v. Hewitt, 91 Mo. 547, there is quoted with approval from 1 Graham and Waterman on New Trial (2 Ed.), 451 (*452), the following, to-wit:

"The reason for holding parties so tenaciously to the damages found by the jury in personal torts is, that in cases of this class there is no scale by which the damages are to be graduated with certainty. They admit of no other test than the intelligence of a jury governed by a sense of justice. . . . To the jury, therefore, as a favorite and almost sacred tribunal, is committed, by unanimous consent, the exclusive task of examining the facts and circumstances, and valuing the injury and awarding compensation in damages. The law that confers on them this power and exacts of them the performance of this solemn trust, favors the presumption that they are actuated by pure motives, . . . and it is not until the result of the deliberation of the jury appears in a form calculated to shock the understanding and impress no dubious conviction of their prejudice

and passion, that courts have found themselves compelled to interpose." [Dowd v. Air Brake Co., 132 Mo. 579; Woodson v. Scott, 20 Mo. 272; Chouquette v. Railroad, 152 Mo. 257; Kuenzel v. Stevens, 155 Mo. 280; McCloskey v. Pulitzer Pub. Co., 163 Mo. 22.]

The instructions taken all together presented every phase of the case to the jury, and are free from substantial error.

Our conclusion is that the judgment should be affirmed. It is so ordered.

All of this Division concur.